[No. B165450. Second Dist., Div. Two. Apr. 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
EDGAR I. PEREZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I. through VI., the last paragraph of part VII., and parts VIII. through X.

## COUNSEL

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOI TODD, J.**—Edgar I. Perez appeals from the judgment entered upon his conviction by jury of attempted murder, in the commission of which he personally and intentionally used and discharged a firearm, causing great bodily injury (Pen. Code, §§ 664, 187, subd. (a), 12022.53, subds. (b), (c), (d)), and two counts of making criminal threats, in the commission of which he personally used a firearm (Pen. Code, §§ 422, 12022.5, subd. (a)(1)). The jury found that the attempted murder was committed for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(1).[1] Appellant was sentenced to prison for nine years for attempted murder, with a firearm enhancement of 25 years to life, and to a consecutive term of eight months, with a firearm use enhancement of one year four months, on each of the criminal threat counts. In addition, he was sentenced to a term of life for the criminal street gang enhancement.

Appellant contends that (1) the trial court failed to instruct the jury on the lesser included offense of attempted criminal threat; (2) the evidence was insufficient to support the conviction of making a criminal threat against Sagun Chhin; (3) the trial court failed to instruct the jury on the elements of the crime that was threatened; (4) section 422 is unconstitutionally vague; (5) the prosecution of appellant's statement as a criminal threat violated his right to freedom of speech; (6) the evidence was insufficient to support the finding of firearm use on the criminal threat counts; (7) the admission of a hearsay statement under the spontaneous declaration exception was erroneous and violated his right of confrontation; (8) the evidence was insufficient to support the gang enhancement; (9) it was error to fail to identify and state the elements of the predicate offenses required to establish a pattern of criminal

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

activity for the criminal street gang enhancement; (10) the trial court erred in failing to instruct the jury on the evaluation of hypothetical questions pursuant to CALJIC No. 2.82; (11) trial counsel provided ineffective assistance in failing to object to the admission of irrelevant evidence; (12) the trial court failed to state a valid reason for imposing consecutive sentences; and (13) the trial court erred in imposing a life sentence on the criminal street gang enhancement.

We reverse the finding on the criminal street gang allegation because the evidence failed to establish a requisite element of that allegation. In addition, we reverse the conviction of making a criminal threat against Sagun Chhin because of instructional error. We otherwise affirm.

## FACTS

Viewed in accordance with the usual rules on appeal (*People v. Snow* (2003) 30 Cal.4th 43, 66 [132 Cal.Rptr.2d 271, 65 P.3d 749], the evidence established that at approximately 3:00 on the afternoon of February 21, 2002, Siuva C., a teenage Asian male, was walking with Melinda L., his girlfriend's 11-year-old sister, on 17th Street near Rose Avenue in Long Beach. Appellant and another Latino youth approached them on bicycles, and appellant pushed Siuva's shoulder and told him to move. Siuva did so, observing an object that looked like a gun in appellant's hand. After appellant and his companion reached the end of the block, appellant rode back and asked Siuva where he was from. Siuva, who was not a gang member, said, "Nowhere." Appellant held the gun on the steering wheel of his bicycle at a distance of three or four feet from Siuva. He stated, "Fuck Nips,"[2] and fired two shots, striking Siuva in the chest and upper stomach. He then rode off toward Rose Avenue.

Siuva was taken to a hospital, where his spleen and part of his large intestine were removed and he had surgery on his kidneys. As a result of the shootings, his ability to walk and run was limited because his lungs could collapse at any time. Officers recovered two shell casings from the scene of the shooting.

Zenaida Cabiera heard the gunshots outside her house on the corner of Rose and 17th and saw an individual riding a bicycle on Rose toward 15th Street. As he rode away, he laughed and said, "Pop, pop."

---

[2] "Nips" is a derogatory word for Asians.

Savy S., a teenage Asian male, was in the front yard of his Rose Avenue house shortly after 3:00 that afternoon with his mother, Sagun Chhin, and his infant brother. He and his mother heard the gunshots coming from the corner of Rose and 17th. A few minutes later, Savy saw appellant and a companion riding chrome BMX bicycles on Rose toward 15th Street. As appellant rode by Savy and Chhin, he waved a gun in the air and said, "Fuck Nips. We gonna kill all Nips." As appellant said this, he was looking at Savy, his mother and his brother. Although appellant did not stop when he made the threat and did not point the gun directly at Savy, Savy was frightened. He believed that appellant was going to carry through with his threat.

Chhin, Savy's mother, testified that she became nervous and fearful after hearing the gunshots, and when she "saw a lot of people making commotions," she sat down and ducked, hugging her infant because she was afraid the baby would be shot. She testified that she did not see anything and did not hear anyone say anything to her family, and she denied telling her daughter, Chanky Ork, that someone came up on a bicycle and threatened to kill her family. Ork testified that Chhin called her at work shortly thereafter and told her that a boy on a bicycle had shot an Asian boy next to their house. Chhin stated that she believed the boy had died. Chhin had her head down and did not look at the boy on the bicycle. Ork further testified, "She [Chhin] said she was standing right in front of the house with her head down, and he just threatened. She doesn't know if it's a threat to her or to whom, but all she heard he said was he will kill all Asians, and she had her head down ready to duck cause she was afraid he might shoot too." Chhin told Ork that she was afraid to be in court.

One of the police officers who arrived at the scene brought Melinda L. to view three individuals who had been detained. Appellant was not one of the three. Melinda did not identify any of the three as the shooter.

Siuva described the shooter to police and, five days after the shooting, he identified appellant's photograph from a photographic lineup. Siuva indicated that he was 75 to 80 percent positive and that he was not 100 percent positive because, in the photograph, appellant's hair was "a little longer." Savy identified appellant's photograph from the photographic lineup, writing, "Number 12 is the guy that had the gun in his right hand and said that stuff to me and my mom." He testified at trial that he had been 75 percent sure. Zenaida Cabiera also identified appellant from the photographic lineup, writing, "Number 12 looks like the guy. I can't be positive because I only

saw him from the side as he passed by." She stated that she had not chosen any of the other photographs because "they looked different."

At trial, Siuva testified that he saw appellant's face for 10 to 20 seconds while appellant was riding back towards him, and he testified that he was positive appellant was his assailant. Savy testified that he saw appellant's face for five seconds, and he identified him at trial. Cabiera stated that the person she had seen at the time of the shooting was not in the courtroom but acknowledged that she did not look around the courtroom to see if he was present.[3] Melinda L. identified appellant at trial.

A few weeks later, on March 13, 2002, appellant was arrested at his family's residence, about a mile or mile and a half from the location of the shooting of Siuva C. Police officers searching appellant's home found two .38-caliber bullets, six .32-caliber bullets, and one .22-caliber bullet, as well as 30/30-caliber shotgun ammunition, in a fanny pack in his mother's bedroom. A .40-caliber bullet was found in appellant's bedroom on a shelf next to his bed. In his bedroom were also found a baseball cap with the letters "CLB," which stood for Crazy Latin Boys, a Long Beach gang, as well as photographs and negatives showing appellant with other Hispanic males making gang signs with their hands, together with papers with the letters CLB and gang names on them. The officers also found a paper with the word "Nips" with an X over it, a newspaper article about the death of Martin Mendoza, stating that he had died in an apparent gang shooting, a piece of paper stating "in loving memory of Mark [*sic*] Mendoza" and a program from Mendoza's funeral. The barrel of a shotgun and an old bolt-action rifle were found in the garage. In a search of another location, a photo album was found which included photographs of a number of people, including appellant, around a casket containing Mendoza's body.

Mendoza had been shot to death on February 15, 2002, during a gun battle in Long Beach with members of an Asian gang. The next day, three Asian gang members were shot near the area of East 20th Street, Long Beach. Two days later, on February 18th, an Asian teenager was shot near East 15th Street, Long Beach. The police did not know if the latter victim was a gang

---

[3] During this exchange, the prosecutor asked Cabiera why she was looking at the jury box and at the judge. In his argument, the prosecutor pointed out that Cabiera would not look at appellant when she was asked if the person she had seen was in the courtroom.

member, although there was Asian gang graffiti in the area. A police officer testified that when the youth was asked who shot him, he stated, "CLB." Long Beach Latino and Asian gangs had been enemies for 10 or 15 years.

Officers recovered 4 nine-millimeter shell casings from the scene of the February 16th shooting and 4 nine-millimeter casings from the scene of the February 18th shooting. A Long Beach Police Department criminalist determined that the casings recovered from the scenes of those crimes, as well as the casings recovered from the scene of the shooting of Siuva C., all had been fired from the same gun.

Detective Abel Morales, a gang expert, characterized the relationship between Asian and Hispanic gangs in Long Beach in 2002 to be one of hatred, which manifested itself in shootings and murders. The CLB gang considered itself a rival of all Asians and Blacks. Appellant acknowledged to a Long Beach police officer in February 2001 that he was affiliated with CLB. On March 6, 2002, shortly before his arrest, he told an officer that he belonged to East Side Longo, a gang that was affiliated with CLB, and on March 12, 2002, the day before his arrest, he told another officer that he was from the CLB gang. He stated that his moniker or nickname was Evil or Little Evil. Detective Morales testified that the gang writings in appellant's room showed that he was a hardcore CLB gang member. One writing found in appellant's room referring to Hispanic gang members had the letters N and A crossed out, an indication of disrespect symbolizing the intent to shoot or kill Blacks and Asians.

Detective Morales testified that the CLB gang began about six years earlier with 10 members, and at the time of trial it had approximately 20 members. It was allied with the East Side Longos, a gang with over 300 members. Detective Morales had investigated crimes committed by the CLB gang, including the attempted murder of a young Asian boy approximately six years earlier. In that crime, the gang members asked the boy, who did not speak English, where he was from and then beat him until he was comatose.

When a gang member asks "Where are you from," he is planning to engage in violence. A gang member gains respect within the gang by committing crimes, and shooting a member of a rival race "would be instant respect." Gang members do not commonly keep their guns at their own houses. Guns are passed around from one member to another, particularly to individuals who are not on parole or probation and thereby subject to searches, so the gang members may avoid being linked to a particular

shooting. In the detective's opinion, the different types of ammunition found in appellant's house meant that appellant was able to obtain guns to match these types of ammunition.

Gang members commonly keep newspaper articles about deceased fellow gang members, and the presence of the article about Mendoza's death in appellant's room indicated that he had been close with Mendoza. Gang members believe they are required to avenge the death of a fellow gang member. Detective Morales therefore found it significant that there had been a shooting of three Asian youths the day after Mendoza's death, followed by the shootings of other Asian youths, some of whom were gang members and some of whom were not, in the days that followed. The shooting of Siuva was in retaliation for actions taken by the Asian gang members.

The prosecutor posed a hypothetical to Detective Morales including the following: that appellant admitted membership in CLB and that his moniker was Evil or Little Evil, that the killing of Mendoza was immediately followed by the shootings of the Asian gang members and other Asian youths, that appellant asked Siuva where he was from and said, "Fuck Nips" before shooting him, that the shooting of Siuva was done in the daytime and appellant was accompanied by another person at the time, that appellant stated something like "Fuck all Asians, I'll kill you too" as he waved a gun at an Asian family, and that gang photos and materials were found in appellant's house. Given these circumstances, Detective Morales was of the opinion that the shooting of Siuva was for the benefit of appellant's gang.

In defense, appellant's mother testified that appellant stayed home from school on February 21, 2002, and left the house on a bicycle shortly after noon. He returned at approximately 3:30 or 4:00 p.m. The clothing he was wearing that day did not resemble that described as having been worn by Siuva's assailant. She did not remember where appellant was on earlier dates in February except that he did not go to school on February 18 and had been in and out of the house with friends. She had been concerned about his "hanging out" with gang members, although she denied knowledge of CLB. She claimed that the garage where the shotgun barrel and rifle had been found was rented to someone other than a family member and that none of her family's property was in the garage.

Appellant's younger sister testified that on February 21, 2002, she saw appellant on Fifth Street and Walnut, near their house, as she was walking home from school with Jose Medina, her mother's boyfriend, sometime before 2:45 p.m. Appellant was not on a bicycle. Appellant returned home at 3:30 or 4:00 p.m. His sister acknowledged that appellant sometimes rode a friend's chrome-colored BMX bicycle that was kept at appellant's house.

Medina, who stated that he was a good friend of appellant's, also testified that he saw appellant walking on Fifth Street between 2:30 and 2:40 p.m. that day, and he stated that appellant had not returned home by the time Medina left for work at 3:30 p.m. Medina denied that he was a member of the CLB gang and denied knowing whether appellant was a member of the gang.

## DISCUSSION

I.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VII. *The evidence was insufficient to establish the criminal street gang allegation.*

Appellant contends that the evidence failed to support the jury's finding that the attempted murder was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). He argues that there was insufficient evidence of two of the elements of the enhancement allegation, that the gang's primary activities were the commission of enumerated crimes and that the predicate offenses established a pattern of criminal gang activity. We agree that the evidence failed to establish that the gang's primary activities were the commission of enumerated crimes.

Under section 186.22, subdivision (f), the prosecution must establish that the gang has "as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of subdivision (e) . . . ." The acts enumerated in subdivision (e) include, in part, unlawful homicide or manslaughter, felonious assault, possession of a concealable firearm, sale of narcotics, threats to commit crimes resulting in death or great bodily injury as defined in section 422, and the intimidation of witnesses and victims as defined in section 136.1.

"To trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute . . . . [¶] . . . [¶] Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322, 323 [109 Cal.Rptr.2d 851, 27 P.3d 739].) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily

---

*See footnote, *ante*, page 151.

enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Id.* at p. 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*People v.*] *Gardeley* [(1996)] 14 Cal.4th 605[, 620] [59 Cal.Rptr.2d 356, 927 P.2d 713]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.]" (*Sengpadychith, supra,* at p. 324.)

Respondent urges that Detective Morales's testimony regarding CLB's history of racial hatred and violent acts toward Asians, including the beating of an Asian child some years earlier and the shootings of Asian men in February 2002, as well as the instant offenses, suffices to establish this element.[5] This claim lacks merit.

■ No expert testimony such as that provided in *People v. Gardeley, supra,* 14 Cal.4th at page 620, was elicited here. Even if we assume that the CLB gang was responsible for the shootings of Asians on February 16 and 18, as well as the shooting of Siuva C., such evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish that "the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 324.) In the absence of proof of this element of the criminal street gang allegation, the finding on the allegation must be stricken.

\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VIII.—X.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5] In the prosecutor's closing argument, he attempted to rebut defense counsel's claim that shooting people was not established to be the primary activity of the CLB gang. The prosecutor stated, "I submit to you what else were they doing for that one week in time after their friend had been killed? They shot numerous people. That's a primary activity."

\*See footnote, *ante,* page 151.

## DISPOSITION

The true finding on the criminal street gang allegation is reversed and the life term imposed for that allegation on count 1, attempted murder, is stricken. The judgment is reversed as to count 3, criminal threat, with directions as follows: If the People do not bring appellant to trial on that count within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision (a)(2), the judgment shall be deemed modified to reflect a conviction of attempted criminal threat in count 3 and a consecutive sentence of four months on that count. In all other respects, the judgment is affirmed.

Boren, P. J., and Nott, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 2004.