174 Cal.App.4th 1335 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
BENITO CORTES, Defendant and Appellant.
No. B206770.
Court of Appeals of California, Second District, Division Five.
June 16, 2009.
As modified June 17, 2009.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1337 Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jason Tran and Stephanie C. Brenan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
TURNER, P. J.

I. INTRODUCTION
Defendant, Benito Cortes, appeals from a judgment after a jury convicted him of first degree murder (Pen. Code,[1] § 187, subd. (a)) (count one) and attempted willful, deliberate, premeditated murder (§§ 664, 187, subd. (a)) (count two). The murder victim was Vincent Villa. The attempted murder victim was Tommy Iles. The jury also found true allegations a principal personally used a firearm (§ 12022.53, subds. (b), (e)) (both counts); a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)) (both counts); a principal personally and intentionally discharged a firearm proximately causing Mr. Villa's death (§ 12022.53, subds. (d), (e)) (count one); and the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)) (both counts). Defendant received a sentence of 60 years to life consecutive to a life sentence plus 30 years. Defendant argues there is insufficient evidence that one of the "primary activities" of his gang consisted of murder or attempted murder so that the true finding on the gang allegations for both counts must be reversed; the trial court erred in imposing sentence under both sections 12022.53, subdivision (d) and 186.22, subdivision (b) because there was no finding that defendant personally used a firearm; reversal of the street gang allegations requires reversal of the section 12022.53 enhancements; if there is sufficient evidence to support the gang allegations, the abstract of judgment should be amended to reflect that the section 12022.53 enhancements were imposed under subdivisions (c), (d), and (e)(1) rather than only subdivisions (c) and (d); and the oral restitution fine orders must be reversed because they failed to select an amount of the fine. The Attorney General argues that the abstract of judgment must be corrected to impose two $20 court security fees pursuant to section 1465.8.
*1338 In the published portion of the opinion we hold there is substantial evidence defendant's gang meets the definition of a "criminal street gang" set forth in section 186.22, subdivision (f). Specifically, we reject defendant's argument the record does not contain substantial evidence that one of his gang's primary activities is conduct specified in section 186.22, subdivision (e)(1) through (25) and (31) through (33). In the unpublished portion of the opinion, we make certain sentencing modifications but otherwise affirm the judgment.

II. BACKGROUND

A. The Shootings
We view the evidence in a light most favorable to the judgment. (Jackson v. Virginia (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; People v. Elliot (2005) 37 Cal.4th 453, 466 [35 Cal.Rptr.3d 759, 122 P.3d 968]; Taylor v. Stainer (9th Cir. 1994) 31 F.3d 907, 908-909.) On February 9, 2005, at approximately 4:15 p.m., Mr. Villa and Mr. Iles were shot as they exited a liquor store located at Palos Verdes and 11th Streets in San Pedro. Mr. Villa was shot multiple times and died from his wounds. Mr. Iles had a superficial wound to his side. A latent print lifted from the bathroom of a nearby boardinghouse where the assailants had run was matched to the codefendant Luis Aurello Garcia. Latent prints lifted from a gun found outside the boardinghouse matched those of defendant.
Daniel Sarmiento was in the area of Palos Verdes and 11th Streets on February 9, 2005, at around 4:15 p.m. just before the shootings. Mr. Sarmiento was a friend of Mr. Iles, who belonged to a street gang. Mr. Iles's gang was a coalition of one African-American and one Hispanic gang. Mr. Iles's gang was a rival of defendant's gang. Mr. Sarmiento saw Mr. Iles walking towards the liquor store. Mr. Sarmiento also knew defendant. Defendant drove by in a gray Nissan four times. The Nissan belonged to defendant. The first time defendant was with his girlfriend. The second and third times that defendant drove by he was alone in the car. Defendant then drove by a fourth time with three male passengers. The three male passengers were wearing bandanas covering their faces. Defendant was not wearing a bandana.
Mr. Sarmiento believed something was about to happen and started walking towards the store to warn Mr. Iles. Before reaching the store, Mr. Sarmiento saw defendant standing outside the car. Defendant was wearing a bandana over his face from the nose down. Mr. Sarmiento saw Mr. Iles (who was African-American), Mr. Villa (who was a Latino), and a third man (who was African-American) walk from the liquor store. *1339 Mr. Sarmiento heard four gunshots and saw Mr. Villa fall to the ground after the first shot. After the fourth shot, Mr. Iles pulled out a gun and fired back at his assailants.
Another eyewitness was a friend of Mr. Villa. Just before the shooting, Mr. Villa's friend was walking towards the liquor store. While approaching the liquor store, Mr. Villa's friend saw defendant's Nissan circle the block. There were three people inside the Nissan who had their faces covered with blue bandanas. The driver got out of the car and fired five or six gunshots at Mr. Iles. Mr. Villa was not a gang member. Mr. Villa also had African-American friends. About a week before the shootings, gang graffiti was written on Mr. Villa's garage. Mr. Villa's friend also saw rival gang graffiti written and crossed out on the garage. Mr. Villa's friend knew that the rival gang initials were those of the two African-American gangs.
Another witness saw the shooting as he was leaving an apartment building that overlooked 11th Street. The witness saw two Latinos fire four to five shots from handguns and then heard the sound of a different gunshot. The witness was unable to identify defendant as the gunman from a photograph. However, at trial, the witness testified that defendant and Mr. Garcia looked like the gunmen.
Los Angeles Police Department Detective Fernando Rivas testified that the shoes of Rommell Lenigan were found at the shooting scene. Mr. Lenigan was a member of defendant's gang. In fact, Mr. Lenigan, who used two different monikers, was a member of the same clique within the gang as defendant. Mr. Lenigan also had tattoos on his stomach which refer to a public housing project in San Pedro. The public housing project is where many of defendant's fellow gang members congregate.

B. Gang Testimony
Detective Rivas testified on behalf of the prosecution concerning defendant's gang and its relationship to the killing of Mr. Villa and the wounding of Mr. Iles. While employed by the Los Angeles Police Department, Detective Rivas spent eight years assigned strictly to gang units. Detective Rivas was assigned to the gangs involved in this case. Detective Rivas had investigated over 200 gang crimes within the last seven years. He had interviewed in excess of 300 to 400 gang members. Detective Rivas is a member of the California Gang Investigators Association and the South Bay Gang Task Force.
Detective Rivas testified principally concerning the two rival gangs involved in the February 9, 2005 killing of Mr. Villa and wounding of Mr. Iles. *1340 He also testified briefly as to two other gangs. The first gang was a predominately Hispanic gang with 550 members which had originated in the early 1970's. Defendant and Mr. Garcia belonged to the first Hispanic gang. Defendant's gang consisted of four different cliques or sects. A member of defendant's gang may be tattooed with the name, number, or initials of an individual clique within the gang. Many of the gang members, regardless of the clique to which they belonged, wore a particular baseball cap which had one of the initials of the gang. Detective Rivas testified that defendant associated with the members of the first Hispanic gang. Prior to the shooting, Detective Rivas never saw defendant's name in any gang database. Detective Rivas did not know when defendant entered the first Hispanic gang.
Mr. Garcia was also a member of defendant's gang. Mr. Garcia, who used two gang aliases, had a tattoo which, when translated into English, stated, "[M]y crazy life." This tattoo was often worn by gang members. One law enforcement gang database states Mr. Garcia is a member of a different gang. However, Detective Rivas had interviewed Mr. Garcia. Although it did not happen often, a person may leave one gang to join a rival gang.
When Detective Rivas initially began observing the first Hispanic gang, its primary color was red. Now, the color had changed to blue. The color blue was used by Hispanic gangs in the southern part of California. The change in colors occurred when a gang member named Charles Mendoza was paroled after serving eight years in prison. Detective Rivas described Mr. Mendoza who, when paroled, was 48 to 50 years old: "He was one of the shot callers for [defendant's gang]. He laid down the law for that gang." Detective Rivas admitted that some members of defendant's clique wore red because they identified with the University of Southern California which has similar colors. The southern Hispanic gangs would use the number 13 while their northern counterparts would use the number 14. The number 14 is used because "n" is the 14th letter in the alphabet. The letter "n" refers to the northern part of California. (Mr. Mendoza eventually died of a heroin overdose.) Detective Rivas testified defendant's gang was involved in criminal street activity such as vandalism; narcotics sales; robbery; attempted murder; and rape. Defendant's gang dominated most of San Pedro and frequented areas near low-income housing projects, parks, and the waterfront where they would consume alcohol and smoke marijuana. According to Detective Rivas, Southern California Hispanic gangs are controlled by the Mexican mafia.
The rival gang consisted of two gangs which had aligned themselves with one another. The rival gang consisted of a coalition of one Hispanic and one African-American gang. The Hispanic faction consisted of 50 to 60 persons. The African-American gang had 80 to 85 members. Members of the African-American group wore or displayed black or blue bandanas. It was uncommon, but not unheard of, for persons of different races to belong to one *1341 another's gangs. These two gangs allied themselves because they had fewer members than defendant's gang. In February 2005, defendant's gang and the coalition of the Hispanic and African-American gangs were enemies. Mr. Iles was a member of the African-American faction of the rival gang.
Detective Rivas also briefly testified concerning a third gang. For the previous 30 years, the third gang and defendant's gang had been enemies. At the time of the shooting in this case, defendant's gang would shoot "on sight" members of the third gang. A fourth gang's relationship with defendant's gang was so hostile their members could not associate with one another.
At the time of the shootings on February 9, 2005, there was, in Detective Rivas's opinion, a "war" occurring between defendant's gang and the rival coalition of the two smaller gangs. When arrested, defendant had "RIP" tattooed on his arm. Also tattooed on the same arm was the moniker of a fellow gang member, the late Joseph Esparza. The reference to "RIP" followed by Mr. Esparza's gang moniker referred to his death. Other gang members had similar tattoos. Mr. Esparza was a "shot caller" in a clique of defendant's gang. Mr. Esparza had been killed in a gunfight with Francisco Moreno. Mr. Moreno was a "shot caller" in Mr. Iles's gang. Detective Rivas was unsure of Mr. Moreno's exact ethnicity.
During a search of defendant's home, the police found 17 rounds of ammunition; red and blue bandanas, the old and new colors of his gang; a photograph of defendant displaying hand signs for a clique of his gang; a piece of cardboard containing gang inscriptions written in green; and a letter containing gang references. In the photograph of defendant, he was displaying a hand signal used by his gang. The hand signal referred to a clique in defendant's gang. The cardboard contained lettering consisting of the initials of defendant's gang; the initials of the clique defendant identified with within the gang; a number 13 which, as noted, is used to identify Southern California gangs; letters identifying the initials of the clique in defendant's gang; and a list of the names of the gang members in his clique which is known as a rollcall. Among the aliases on the cardboard was Mr. Garcia's gang moniker. Written on the cardboard was the Penal Code section for murder, 187, which, according to Detective Rivas, is a "death threat." There were a number of initials representing rival gangs that had been crossed out including the rival gang which consisted of the coalition of the smaller Hispanic and African-American gangs to which Mr. Iles belonged. Detective Rivas described what it means to cross out a rival gang's name or initials: "Basically disrespecting them and telling them that they are enemies. Those are their enemies." The writing describes the gang's activities as including driveby shootings. Detective Rivas testified that the writing identifies the *1342 initials of defendant's gang; refers to riding and enemies; and means, "[W]hen they ridewhen they come up on their enemies and commit crimes, such as murder."
In Detective Rivas's opinion, the killing of Mr. Villa and the attempted murder of Mr. Iles furthered the goals of and benefited defendant's gang. Detective Rivas based his opinion on the following factors: the fact that the car drove by several times prior to the shootings was evidence of planning by fellow gang members; defendant and Mr. Garcia were shooting at rival gang members; defendant and Mr. Garcia were in rival gang territory; their actions would eliminate their rivals; their conduct would create fear and intimidation in the community that lives in the rival gang area; and the actions of defendant and his fellow gang members show that "this gang is a powerful gang that cannot be messed with." Detective Rivas testified: "By committing those types of crimes, murder, attempt murder, during daylight hours, it also shows that they have no respect towards the law and towards the community and the rival gang members. That they're willing to go out there and do a drive-by shooting against a rival gang territoryin a rival gang hangout. . . ."
Detective Rivas testified that Demetrius Joseph Anderson was convicted of manslaughter arising from a killing which occurred on August 31, 2002. Mr. Anderson is a member of defendant's gang. Another member of defendant's gang, Jason Whitlow, was convicted of two counts of murder as a result of killings that occurred on August 28, 2002. Mr. Whitlow is a member of a clique within defendant's gang.

III. DISCUSSION

A. There Is Substantial Evidence to Support the Gang Findings
Defendant argues there was insufficient evidence to support the gang findings because the prosecution presented insufficient evidence that "a primary activity" of defendant's gang consisted of murder and attempted murder. Section 186.22, subdivision (b)(1) states in part: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows. . . ." Section 186.22, subdivision (f) defines a "criminal street gang" as follows: "As used in this chapter, `criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary *1343 activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.) Section 186.22, subdivision (e)(1) through (25) and (31) through (33)[2] enumerates the criminal acts, the commission of which must serve as one of a gang's primary activities. At issue in this case is the "one of its primary activities" element in section 186.22, subdivision (f).
(1) Our Supreme Court has construed the "having as one of its primary activities" language in section 186.22, subdivision (f) thusly: "The phrase *1344 `primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's `chief' or `principal' occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining `primary'].) That definition would necessarily exclude the occasional commission of those crimes by the group's members." (People v. Sengpadychith (2001) 26 Cal.4th 316, 323 [109 Cal.Rptr.2d 851, 27 P.3d 739]; see People v. Vy (2004) 122 Cal.App.4th 1209, 1222 [19 Cal.Rptr.3d 402].) In People v. Gardeley (1996) 14 Cal.4th 605, 624, footnote 10 [59 Cal.Rptr.2d 356, 927 P.2d 713], our Supreme Court used the terminology "as a primary function" to describe the "having as one of its primary activities" element in section 186.22, subdivision (f).
It bears noting that in Sengpadychith, our Supreme Court gave two examples of groups where crimes were occasionally committed by its members. Citing People v. Gamez (1991) 235 Cal.App.3d 957, 970-971 [286 Cal.Rptr. 894], disapproved in People v. Gardeley, supra, 14 Cal.4th at page 624, footnote 10, our Supreme Court explained: "`Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a primary activity of the department. Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s]. . . . Similarly, environmental activists or any other group engaged in civil disobedience could not be considered a criminal street gang under the statutory definition unless one of the primary activities of the group was the commission of one of the [25] enumerated crimes found within the statute.'" (People v. Sengpadychith, supra, 26 Cal.4th at pp. 323-324, italics omitted; see People v. Perez (2004) 118 Cal.App.4th 151, 160 [12 Cal.Rptr.3d 821].)
(2) Evidence of one of a gang's primary activities might consist of proof: the group's members consistently and repeatedly have previously committed criminal activity listed in section 186.22, subdivision (e) (People v. Sengpadychith, supra, 26 Cal.4th at p. 324; People v. Williams (2009) 170 Cal.App.4th 587, 609 [88 Cal.Rptr.3d 401]); of conduct contemporaneous with the commission of the charged offenses (People v. Sengpadychith, supra, 26 Cal.4th at p. 323; People v. Galvan (1998) 68 Cal.App.4th 1135, 1140 [80 Cal.Rptr.2d 853]); or in the form of opinion testimony often provided by an experienced detective (People v. Ramirez (2009) 172 Cal.App.4th 1018, 1037 [91 Cal.Rptr.3d 658]; People v. Williams, supra, 170 Cal.App.4th at p. 625). Sometimes, the elements of a section 186.22 gang enhancement may be proven by a combination of documentary evidence; percipient witness testimony; and opinion testimony by an experienced investigator. (People v. *1345 Gardeley, supra, 14 Cal.4th at p. 626.) We review a section 186.22 gang enhancement finding for substantial evidence. (People v. Ramirez, supra, 172 Cal.App.4th at pp. 1038-1039; People v. Williams, supra, 170 Cal.App.4th at p. 624.) When conducting substantial evidence review, we consider the evidence in a light most favorable to the judgment and presume the existence of every fact that can reasonably be deduced from the testimony. (People v. Lee (1999) 20 Cal.4th 47, 58 [82 Cal.Rptr.2d 625, 971 P.2d 1001]; People v. Crittenden (1994) 9 Cal.4th 83, 139 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We apply the same standard of review when a case relies in part on circumstantial evidence. (People v. Lee, supra, 20 Cal.4th at p. 58; People v. Stanley (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)
(3) There is substantial evidence that a primary activity of defendant's gang consisted of conduct specified in section 186.22, subdivision (e). Detective Rivas was a highly experienced investigator who was assigned to both defendant's and Mr. Iles's rival gangs. Defendant's gang has existed for 35 years. Detective Rivas testified, "They're involved in criminal street activity that ranges from vandalism to sales of narcotics, robberies, attempt[ed] murders, murders, rapes." Mr. Garcia, who used two gang aliases, was tattooed with the words, "[M]y crazy life,"a tattoo often worn by gang members. Defendant's gang changed its colors after Mr. Mendoza was paroled. The use of red was previously consistent with the colors worn by Southern California Hispanic gangs. The division between the northern and southern Hispanic gangs developed in prison. Detective Rivas testified: "Those two usually feud with each other. They don't get along with each other in . . . prison." According to Detective Rivas, Southern California Hispanic gangs are controlled by the Mexican mafia.
In February 2005, defendant's gang and Mr. Iles's gang were enemies. Detective Rivas testified the two rival gangs were at war. At the very same time, the relationship between defendant's gang and a third gang was such they were expected to shoot "on sight" when they came into contact. A fourth gang's relationship with defendant's gang was so antagonistic their members could not even be in one another's presence.
Mr. Esparza, a "shot caller" in defendant's gang, was shot to death in a firefight with Mr. Moreno. Mr. Moreno was also shot to death by Mr. Esparza, defendant's fellow gang member, in the shoot-out. Defendant wore a tattoo "RIP" next to Mr. Esparza's name. It was common to tattoo "RIP" next to the name of a gang member who had been murdered. Other gang members had the same tattoo.
*1346 The search of defendant's home found ammunition; red and blue bandanas; handwriting identifying defendant's gang as a Southern California gang; a handwritten notation of the number 187 which was a death threat; and a handwritten list of enemy gangs which included Mr. Iles's gang. As previously noted there was a handwritten notation referring to riding and enemies which Detective Rivas explained meant, "[W]hen they ridewhen they come up on their enemies and commit crimes, such as murder."
Detective Rivas testified the killing of Mr. Villa and the wounding of Mr. Iles were perpetrated in a planned effort to further defendant's gang's goals and intimidate the community. One week before the shootings, graffiti referring to defendant's gang was on Mr. Villa's garage. Graffiti on Mr. Villa's garage door referring to two African-American gangs had been crossed out. The eyewitnesses testified defendant was accompanied by three masked individuals. The jury found the murder of Mr. Villa was premeditated as was the attempted murder of Mr. Iles. Previously, one of defendant's fellow gang members, Mr. Anderson, was convicted of manslaughter as a result of an August 31, 2002 incident. Mr. Whitlow, another member of defendant's gang, was convicted of two counts of murder as a result of homicides which occurred on August 28, 2002.
As can be noted, documentary, opinion, and eyewitness testimony demonstrated that after 35 years, defendant's gang engaged in narcotic sales and committed vandalism, robberies, attempted murders, rapes, and murders; was one of the Southern California Hispanic gangs affiliated with the Mexican mafia; was at "war" with Mr. Iles's gang; would shoot members of another gang "on sight"; would not allow its members to be in the presence of another gang; had one of its "shot callers" killed in a mutual gunfight with Mr. Moreno; was prepared to kill if it encountered rival gang members; had a member, defendant, who maintained a written list of his gang's enemies; had four members, Mr. Whitlow, Mr. Anderson, Mr. Garcia, and defendant convicted of murder, manslaughter, or attempted murder; and Mr. Lenigan, one of defendant's fellow gang members, was apparently present at the scene of the shootings of Mr. Villa and Mr. Iles. This constituted substantial evidence defendant's gang had, as one of its primary activities, the commission of crimes enumerated in section 186.22, subdivision (e)(1) through (25) and (31) through (33).
Moreover, defendant's gang's history differs from the two specific examples provided in Sengpadychith of organizations where occasional misconduct did not equate to the "one of its primary activities" element in section 186.22, subdivision (f). As noted, our Supreme Court gave two examples of *1347 organizations where occasional misconduct did not amount to a primary activity. The first example was the Los Angeles Police Department where officers commit crimes and the second case in point was an environmental group where its members engage in civil disobedience. (People v. Sengpadychith, supra, 26 Cal.4th at p. 324; see People v. Perez, supra, 118 Cal.App.4th at p. 160.) Defendant's gang, with its history of fatal shoot-outs, an existing "shoot on sight" relationship with a rival gang, and hatred of other gangs' members does not fit within the paradigms of occasional criminal activity specified by our Supreme Court in Sengpadychith.
There is no evidence defendant's gang had any purpose other than the commission of crime during its 35 years of existence. For example, there is no evidence members of defendant's street gang provided afterschool tutoring; sponsored youth sports activities; encouraged youths to stay in school; ever volunteered to serve in the military; offered to serve as counselors in youth summer camps; voted or helped turn out the vote on election day; cleaned up trash off the beach; attended services in a synagogue, mosque, or church; or even held a job. Defendant's street gang is not a community-based betterment associationthere is no evidence a single member ever committed a single eleemosynary act. By contrast, there is substantial evidence defendant's gang had as one of its primary activities the commission of conduct described in section 186.22, subdivision (e)(1) through (25) and (31) through (33).
Defendant relies on In re Alexander L. (2007) 149 Cal.App.4th 605, 611-614 [57 Cal.Rptr.3d 226], a case where our colleagues in Division Three of the Fourth Appellate District found there was insufficient evidence that a street gang had as a primary activity the commission of section 186.22, subdivision (e)(1) through (25) and (31) through (33) offenses. The facts in Alexander L., a vandalism delinquency proceeding, are materially different from those in the present case. The court in Alexander L. described the brief testimony at the adjudication hearing on the section 186.22, subdivision (f) "one of its primary activities" element: "At trial, [Deputy] Lang testified as a gang expert. He testified generally about the benefits graffiti might create for a gang, such as intimidating rivals. He also stated his opinion that [the minor's gang] was an active street gang as of the date of Alexander's arrest. When asked about the primary activities of the gang, he replied: `I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' No further questions were asked about the gang's primary activities on direct or redirect examination. [¶] [Deputy] Lang's entire testimony on this point is quoted abovehe `kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how [Deputy] Lang had obtained the *1348 information. He did not directly testify that criminal activities constituted [the minor's gang's] primary activities. Indeed, on cross-examination, [Deputy] Lang testified that the vast majority of cases connected to [the minor's gang] that he had run across were graffiti related." (Alexander L., at pp. 611-612.) As noted, Detective Rivas, an experienced gang investigator, presented a materially more comprehensive description of the activities of defendant's gang and its ongoing criminal activity than the sketchy testimony in Alexander L. (See People v. Martinez (2008) 158 Cal.App.4th 1324, 1330 [70 Cal.Rptr.3d 680] [commentary by the court which decided Alexander L. on the negligible evidentiary and foundation showing in that case].)
Nor is the outcome in this case controlled by the decision in People v. Perez, supra, 118 Cal.App.4th at page 160. The relevant facts were described by the court in Perez in its analysis as to why the evidence was insufficient to support the "one of its primary activities" element in section 186.22, subdivision (f): "Even if we assume that the [defendant's] gang was responsible for the shootings of Asians on February 16 and 18, as well as the shooting of Siuva C., such evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish that `the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.' (People v. Sengpadychith, supra, 26 Cal.4th at p. 324.) In the absence of proof of this element of the criminal street gang allegation, the finding on the allegation must be stricken." (People v. Perez, supra, 118 Cal.App.4th at p. 160.) The misconduct frequency specified in Perez is materially different from that in the present case which included a then existing "shoot on sight" policy when defendant's gang confronts a longtime rival gang.

B.-E.[*]

IV. DISPOSITION
The judgment is modified to strike the Penal Code section 186.22, subdivision (b)(1)(C) enhancements imposed as to both counts and impose two Penal Code section 1465.8, subdivision (a) court security fees (for a total of $40). The trial court is to select the amount of the restitution fines as discussed in the body of this opinion. The abstract of judgment is amended to reflect that the firearm enhancements on counts one and two were also imposed pursuant to Penal Code section 12022.53, subdivision (e)(1). Upon remittitur issuance, the superior court clerk shall forward an amended abstract *1349 of judgment to reflect the aforementioned modifications and corrections. The judgment is affirmed in all other respects.
Armstrong, J., concurred.
MOSK, J., Concurring and Dissenting.
I dissent as to defendant's sentence to the extent it is based on a gang enhancement finding and otherwise concur.
Defendant argues with respect to the gang allegations (Pen. Code, § 186.22, subd. (b)(1)(A)) that there is not substantial evidence of one of the requirementsthat the gang has "as one of its primary activities the commission of one or more" of certain enumerated criminal acts. (Pen. Code, § 186.22, subd. (f).) The only testimony bearing on this element was that of the prosecutor's gang expert, when he was asked to describe the makeup and boundaries of the gang; he responded that it is a predominantly Hispanic gang founded in the 1970's and that was "involved in criminal street activity that ranges from vandalism to sales of narcotics, robberies, attempt[ed] murders, murders, rapes." This is the only reference to the gang activities.
The California Supreme Court stated in People v. Sengpadychith (2001) 26 Cal.4th 316, 323-324 [109 Cal.Rptr.2d 851, 27 P.3d 739]. "As we just discussed, evidence of either past or present criminal acts listed in subdivision (e) of [Penal Code] section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang. Would such evidence alone be sufficient to prove the group's primary activities? Not necessarily. The phrase `primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's `chief' or `principal' occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining `primary'].) That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [People v.] Gardeley [(1996)] 14 Cal.4th 605 [59 Cal.Rptr.2d 356, 927 P.2d 713]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See [Pen. Code,] § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on `his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. (Gardeley, supra, at p. 620.)"
*1350 There is not substantial evidence that the "group's members consistently and repeatedly" committed the enumerated activities in the gang statute. (People v. Sengpadychith, supra, 26 Cal.4th at p. 324.) Nor does the expert give any opinion as to the primary activities of the gang. Accordingly, there is not sufficient evidence to support the gang enhancement. (In re Alexander L. (2007) 149 Cal.App.4th 605 [57 Cal.Rptr.3d 226]; People v. Perez (2004) 118 Cal.App.4th 151 [12 Cal.Rptr.3d 821].) I would not have imposed a sentence based on the gang findings.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B.-E.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Section 186.22, subdivision (e) states now and at the time of the shootings in this case: "(e) As used in this chapter, `pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons: [¶] (1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245. [¶] (2) Robbery, as defined in Chapter 4 (commencing with Section 211) of Title 8 of Part 1. [¶] (3) Unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1. [¶] (4) The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in Sections 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code. [¶] (5) Shooting at an inhabited dwelling or occupied motor vehicle, as defined in Section 246. [¶] (6) Discharging or permitting the discharge of a firearm from a motor vehicle, as defined in subdivisions (a) and (b) of Section 12034. [¶] (7) Arson, as defined in Chapter 1 (commencing with Section 450) of Title 13. [¶] (8) The intimidation of witnesses and victims, as defined in Section 136.1. [¶] (9) Grand theft, as defined in subdivision (a) or (c) of Section 487. [¶] (10) Grand theft of any firearm, vehicle, trailer, or vessel. [¶] (11) Burglary, as defined in Section 459. [¶] (12) Rape, as defined in Section 261. [¶] (13) Looting, as defined in Section 463. [¶] (14) Money laundering, as defined in Section 186.10. [¶] (15) Kidnapping, as defined in Section 207. [¶] (16) Mayhem, as defined in Section 203. [¶] (17) Aggravated mayhem, as defined in Section 205. [¶] (18) Torture, as defined in Section 206. [¶] (19) Felony extortion, as defined in Sections 518 and 520. [¶] (20) Felony vandalism, as defined in paragraph (1) of subdivision (b) of Section 594. [¶] (21) Carjacking, as defined in Section 215. [¶] (22) The sale, delivery, or transfer of a firearm, as defined in Section 12072. [¶] (23) Possession of a pistol, revolver, or other firearm capable of being concealed upon the person in violation of paragraph (1) of subdivision (a) of Section 12101. [¶] (24) Threats to commit crimes resulting in death or great bodily injury, as defined in Section 422. [¶] (25) Theft and unlawful taking or driving of a vehicle, as defined in Section 10851 of the Vehicle Code. [¶] (26) Felony theft of an access card or account information, as defined in Section 484e. [¶] (27) Counterfeiting, designing, using, attempting to use an access card, as defined in Section 484f. [¶] (28) Felony fraudulent use of an access card or account information, as defined in Section 484g. [¶] (29) Unlawful use of personal identifying information to obtain credit, goods, services, or medical information, as defined in Section 530.5. [¶] (30) Wrongfully obtaining Department of Motor Vehicles documentation, as defined in Section 529.7. [¶] (31) Prohibited possession of a firearm in violation of Section 12021. [¶] (32) Carrying a concealed firearm in violation of Section 12025. [¶] (33) Carrying a loaded firearm in violation of Section 12031." (See Stats. 2005, ch. 482, § 1.)
[*] See footnote, ante, page 1335.