Filed 10/6/14  P. v. Rodriguez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072561 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F03130) |
| v. | |
| PAUL RODRIGUEZ, | |
| Defendant and Appellant. | |

A jury found defendant Paul Rodriguez guilty of discharging a firearm at an inhabited dwelling and two counts of assault with a firearm, and further found the crimes were committed in furtherance of criminal street gang activities and that defendant personally used a firearm.  (Pen. Code, §§ 186.22, subd. (b)(1), 245, subd. (a)(2), 246, 12022.5, subds. (a) & (d).)[1]  The trial court found true that defendant was 16 years of age

---

[1]  Further undesignated statutory references are to the Penal Code.

1

or older when he committed the offenses. (See Welf. & Inst. Code, § 707, subds. (b) & (d).) The court sentenced defendant to prison for life, with a minimum parole period of 15 years. (§ 186.22, subd. (b)(4)(B).) Defendant timely filed this appeal. On appeal, defendant challenges the gang enhancement, a parole revocation fine, and the custody credit award. We agree with the People that substantial evidence supports the gang enhancement, accept their concessions that defendant's other contentions have merit, modify the judgment, and affirm.

## BACKGROUND

For purposes of this appeal, defendant does not dispute that on April 22, 2009, he fired multiple gunshots at an occupied house. Defendant, Richard Cooper, and Dejwonn Hightower were members of the gang North Highland Gangster Crips. These three Crips obtained two pistols and went looking for Blood members. When they saw their targets in a driveway, defendant and Hightower fired several shots towards them, hitting the house.[2]

The evidence in dispute concerns the gang testimony, which we now describe.

Detective Nick Goncalves, a peace officer for 17 years, had experience and training in gang suppression, particularly relating to Black street gangs. The defense did not challenge Goncalves's expert qualifications. Goncalves had examined defendant's cell phone, as well as Cooper's. Both phones utilized North Highlands Gangster Crip screen savers, and defendant's phone contained several gang-related pictures. The parties stipulated there were numerous calls between these two phones.

The Bloods were the dominant Black street gang, associating themselves with the color red, and whose primary rivals were the Crips including "G Mob and their subsets"

---

[2] Both codefendants were convicted of various counts. Cooper--who testified against defendant--did not appeal, and Hightower's separate appeal is still pending in this court. (See *People v. Hightower*, case No. C071682.)

2

which include the North Highlands area.  Respect is highly important for gang members, and is earned by "putting in work" for a gang, that is, committing violent crimes.  Goncalves described two particular incidents of Crip members using firearms to shoot people.  In one case, a Blood member was killed, resulting in a murder conviction for the Crip shooter; another involved a family dispute leading to a shooting, resulting in assault with a deadly weapon convictions for two Crip members.

Defendant was a validated gang member and had gang tattoos.  Cooper and Hightower, too, were validated gang members.  Defendant had been involved in prior gang activity.  On one occasion he and another gang member planned to burgle residences by knocking on doors to see if anyone was home, and when they were arrested, defendant admitted "burglarizing the house."[3]  On another occasion, defendant and a fellow gang member had been shot, and although defendant would not cooperate with the police, one witness reported it was "probably" a result of a rival gang.  After a letter and picture were found on defendant after a court appearance with Hightower, defendant said he was a North Highlands Gangster Crip.  The picture and letter were gang related, and the letter included references to snitching and putting in work towards the gang, as well as arranging to get into protective custody, so defendant could talk to Cooper.

Hightower had been with other gang members when the group surrounded two persons and asked if they "banged" and then took property from them.  One of Hightower's companions "yelled out Beast Mob killer" when arrested, which showed that incident was gang related.  On another occasion, Hightower and his brother used guns to rob two men, one of whom was a validated Blood member, and pistol-whipped one of

---

[3] On appeal, defendant describes this incident as an *attempted* burglary, which is not an enumerated gang crime, unlike a completed burglary.  (See § 186.22, subd. (e)(11).)  But the testimony that defendant admitted "burglarizing" the house was unrebutted.

their victims and said: "You just got robbed by Monk Mob." The victims in this case were "Beast Mob" members or associates, rivals to the Crips.

After reviewing the records of this case, Goncalves formed the opinion that this crime was gang related, because the violence bolstered the reputations of defendant and his fellow gang members, as well as their gang's reputation. A known active gang member is less likely to be challenged in the streets as far as making money or controlling territory, and "[o]verall the individual in the gang is absolutely bolstered." When shot at by a rival gang member, retaliation is essential to erase the disrespect that act represents. His opinion was "100 percent" sure.

Cooper's testimony dovetailed with Goncalves's testimony. He and defendant were members of the North Highlands Gangster Crips and in April 2009 they associated with subsets such as "TNA" and "Monk Mob." Hightower, with whom they associated frequently, was a Monk Mob member. It was important for gang members to claim territory and to engender respect from others, including rival gangs. To gain respect, they "rob people, shoot at people, [who are] rival gang members, things like that, things of that nature." Fighting with rival gang members would also generate respect. A few months before the instant crimes, there had been an incident at a party Cooper attended with several gang members, at defendant's invitation. When they arrived, they saw many Mexican Norteño gang members. The Norteños made offensive Blood gang comments to defendant, who replied in kind, to counter their disrespect. Eventually one of Cooper's group named "Doe Boy"--not defendant--punched one of the Norteños, and the rest of the group ran to join the fight, to show gang solidarity. When Cooper saw that he was bleeding from a knife cut, he and the others left so that Cooper could get his gun. Instead they went to Hightower's house, where Hightower's mother attended to Cooper's wound, and they spent the night there.

On the day of the instant shooting, Cooper had been using cocaine and marijuana with a friend, and later defendant called to ask if Cooper had his firearm: "I told him,

4

yes, I did. He asked me where I was. Told him Oak Hollow Apartments. And he said, good, because he had to go there any way to grab Lexiano's gun, and he would come pick me up." Lexiano was Alex Tolliver, a now-deceased TNA gang member who was a good friend of Cooper's. Defendant said that St. Clair, an enemy Beast Mob blood member, had been seen, along with "some suckas." A "sucka" is anybody the gang does not get along with. Defendant soon arrived with Hightower driving.

Cooper had bought his gun--a .22-caliber revolver--and testified: "Anybody and everybody, any time I feel disrespected or unsafe, us, as gang members, carry guns all the time." Cooper got in the back seat of the car, as defendant went to Tolliver's apartment and came back with a .357 revolver. Cooper asked where they were going and what they were doing, and was told Tolliver had seen "St. Clair [and] some suckas" outside of a fellow Crip's house (named Matthew Martinez, a.k.a. Crip Face). This was all Cooper needed to know to understand they were going to shoot at the enemy gang members. After discussing the idea of walking to the target, they decided to drive, parked and walked toward the house, with Cooper and defendant carrying their guns. At some point defendant said he would shoot four times "and save two in case they chased him." They passed "a lot of people" in front of their houses, and Cooper said "It's kind of hot out here," meaning there were a lot of witnesses around. They returned to the car and drove past St. Clair and two others and could see two of the men were holding guns. Hightower parked the car past the house. Hightower asked Cooper to let him "get active," and "put in work," meaning benefit the gang, so Cooper gave Hightower his loaded and cocked revolver and Hightower walked off with defendant, after giving Cooper the car keys.

After a minute or two, Cooper heard multiple shots and drove toward them, but after being signaled by Hightower, saw defendant holding his gun toward the house. Eventually Cooper stopped the car and Hightower arrived; Cooper gave him his keys back, and Hightower tossed Cooper's gun in the car, where it was later found. Because

5

the police were in the area, the two men quickly left and hid in some bushes. While they were hiding, with a police helicopter searching, Hightower told Cooper he had put Cooper's gun in the car, which annoyed Cooper, because he thought his fingerprints would be on the gun. He threw his extra bullets over a fence, and eventually left Hightower, but was soon captured. Later the police put him in a car with defendant. Defendant told Cooper he had "tucked it," which meant he had hidden his gun, and had either urinated on or put bleach on his hand, or both, and that he had been arrested on a warrant. Cooper lied to the police, but after a night in jail, he told them the truth, and admitted charges leading to a 20-year sentence in exchange for his truthful testimony. As a "snitch," he could be killed for his testimony.

## DISCUSSION

### I

### *Gang Enhancement*

Defendant contends no substantial evidence shows defendant's gang qualifies as a criminal street gang under the relevant statutes, because the People "failed to establish that statutorily enumerated crimes of the gang constitute one of its 'primary activities.' " We disagree.

"In determining whether the evidence is sufficient to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)

The relevant statute provides that a " 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members

6

individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f), emphasis added; see *People v. Sengpadychith* (2001) 26 Cal.4th 316, 322 (*Sengpadychith*) ["the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute"].) The referenced crimes include assault with a deadly weapon or by means likely to cause great bodily harm, robbery, unlawful homicide, burglary and unlawfully carrying a loaded firearm. (§ 186.22, subd. (e)(1), (2), (3), (11), (33).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently* and *repeatedly* have committed criminal activity listed in the gang statute." (*Id*. at p. 324; cf. *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 [isolated conduct insufficient]; *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [scant and remote conduct insufficient].)

The fact, emphasized by defendant on appeal, that Goncalves did not explicitly and directly list the "primary" activities of the gang is not dispositive. (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 106-108.) He testified violent acts constituted "putting in work" for the gang, and described two specific incidents involving gang members shooting at people, resulting in murder and assault with a deadly weapon convictions. Such incidents bolster respect both for the gang members perpetrating the crimes and respect for the gang as a whole. They qualify as gang activities. (§ 186.22, subd. (e)(1) & (3).) He also described two robberies, and the burglary defendant admitted. (See fn. 3, *ante*.) They, too, qualify as gang activities. (§ 186.22, subd. (e)(2)

7

& (11).)[4] Contrary to defendant's evident view, these crimes were based on his review of reports, not "non-specific hearsay," and no hearsay objections were lodged.

Defendant also ignores Cooper's testimony, who described the activities of the gang as including robbing and shooting at people, which qualify as gang activities under section 186.22, subdivision (e)(1) and (2). Cooper then vividly described the reason for the shooting in this case, as an attack on enemy gang members, to garner respect, and in particular testified that Hightower wanted to "put in work" for the gang and asked to use Cooper's gun to do so. Finally, he described the trio driving with loaded guns, and then Hightower and defendant walking down the streets while armed, which qualify as gang activities under section 186.22, subdivision (e)(33). (See § 25850, subd. (a), former § 12031, subd. (a)(1).)

Defendant may be correct that the better practice may have been for the prosecutor to directly ask the expert to list the gang's principal activities. This was not done. But the absence of such a direct question was not fatal to showing the North Highlands Gangster Crips was a criminal street gang. The expert was first asked to describe the definition of a criminal street gang, and listed several enumerated activities, such as murder, assault with a deadly weapon, robbery, burglary and unlawful possession of firearms, and then was asked if he could provide "two examples of the primary activities" of the gang. He then described a murder, an assault with a deadly weapon case, and the burglary case involving defendant. That sufficed.

From all of this evidence, a rational jury could conclude that commission of statutorily enumerated crimes was a primary purpose of the gang.[5]

---

[4] In a cryptic reply to one question, Goncalves also referenced gang members talking about selling drugs, another enumerated crime. (§ 186.22, subd. (e)(4).)

[5] To the extent defendant recasts his claim as a federal due process violation, it fails because substantial evidence supports the enhancement. And to the extent his briefing

## II

### *Parole Revocation Restitution Fine*

Defendant contends, and the People concede, that the $8,000 parole revocation fine should instead be $3,000, because that fine must be equal to the $3,000 restitution fine imposed.  (§ 1202.45; see *People v. Villalobos* (2012) 54 Cal.4th 177, 181.)  Accordingly, we shall modify the judgment to reflect a stayed parole revocation restitution fine of $3,000.[6]

## III

### *Custody Credits*

Defendant contends, and the People concede, that he is entitled to 1281 days of actual conduct credit, not 1280 days as awarded.  We agree, and modify the judgment accordingly.

---

may be read to claim his right to associate with others has been breached, we disagree. (See *People v. Loeun* (1997) 17 Cal.4th 1, 11.)

[6]  The $8,000 listing may merely be a typographical error in the reporter's transcript.  The probation report recommended that the two fines be equal, and the abstract of judgment lists both fines as $3,000.

9

## DISPOSITION

The judgment is affirmed as modified.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                    DUARTE            , J.



We concur:



      BLEASE        , Acting P. J.



      ROBIE         , J.