Filed 5/21/14  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HECTOR GARCIA,<br><br>  Defendant and Appellant. | G047638<br><br>(Super. Ct. No. 09WF1043)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed in part, reversed in part, remanded for resentencing.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Hector Garcia of the April 25, 2009 kidnapping during carjacking, kidnapping to commit robbery, and forcible rape of A.P. (Pen. Code §§ 209.5, subd. (a), 209, subd. (b)(1), 261, subd. (a)(2), counts 1, 2 and 4, all further statutory references are to the Penal Code); the April 26 robbery of Donald K. (Donald) (§ 211, count 5); the April 27 robbery and gang-related battery of Juan A. (Juan) (§§ 211, 242, 186.22, subd. (d), counts 7 and 8); and active participation in a criminal street gang (§ 186.22, subd. (a); counts 6 and 9).

The jury also found defendant committed counts 1, 2, 5, and 7 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); personally used a deadly weapon in the commission of counts 1 and 2 (§ 12022, subd. (b)(1)); and personally inflicted great bodily injury in the commission of count 5 (§ 12022.7, subd. (a)).

The trial court sentenced defendant to state prison for an aggregate term of 55 years to life, comprised of two consecutive indeterminate life terms, each with the possibility of parole and a minimum term of 15 years, all consecutive to a total determinate term of 25 years. Defendant was 17 years old on the offense dates.

Defendant contends: (1) there is insufficient evidence to support the great bodily injury finding and the criminal street gang convictions and findings; (2) the trial court erred in giving the criminal street gang jury instructions; (3) the trial court erred by imposing sentence for both the kidnapping during a carjacking and the kidnapping to commit robbery of the same victim; (4) the prosecutor engaged in misconduct and defense counsel rendered ineffective assistance during closing arguments; and (5) the sentence imposed violates the constitutional prohibitions against cruel and unusual punishment and the constitutional guarantee of equal protection.

We conclude there is sufficient evidence to support the great bodily injury finding, but there is insufficient evidence to support the criminal street gang convictions and findings. Consequently, we reverse the criminal street gang convictions on counts 6 and 9, and the criminal street gang findings associated with counts 1, 2, 5, 7 and 8.

2

We also conclude the trial court did not err by imposing sentence for both the kidnapping during a carjacking and the kidnapping to commit robbery; the prosecutor did not engage in misconduct; and defense counsel did not render ineffective assistance. So we affirm the convictions on counts 1, 2, 4, 5, 7 and 8, as well as the deadly weapon and great bodily injury findings associated with counts 1, 2 and 5.

Because our partial reversal materially alters defendant's aggregate sentence, and because that sentence involved various discretionary sentencing choices, we remand the matter to the trial court for resentencing on the convictions and findings affirmed. (*People v. Calderon* (1993) 20 Cal.App.4th 82, 88.) This disposition moots defendant's gang jury instruction and constitutional sentencing contentions.

**FACTS**

*April 25, 2009*

Some time after midnight on April 25, 2009, A.P. parked her Honda Civic near her home in Garden Grove. As she opened her car door, A.P. heard and saw two men, later identified as defendant and Anthony Robles, walking toward her car. Robles walked to the passenger side of her car while defendant approached the driver's side. Defendant grabbed her car door, thrust a pocketknife at her, and demanded she give him her car. He then directed A.P. to move to the passenger seat. Robles got into the back.

Defendant got into the driver's seat, started the car, and drove toward a nearby freeway. He grabbed A.P.'s cell phone and handed it to Robles. Robles removed the battery. Both men went through her purse. They grabbed $5, which was all the money A.P. had with her. She gave them her money because "they had a knife."

Defendant drove erratically and Robles told him to "chill out." After a short time, defendant pulled the car over and A.P. took the wheel. Defendant continued to waive the knife in the air as she drove. A.P. asked the men why they were robbing her, and defendant told her they needed money to post bail for a jailed friend in Lake Elsinore. Later, defendant told her they needed money for beer and "crystal."

3

A.P. drove on the freeway for some time until defendant directed her to exit the freeway so he and Robles could "rob some people." Defendant told A.P. to park in a Starbucks's parking lot right off the freeway. Defendant and Robles talked about robbing three women they saw inside the Starbucks, and they argued over who should do the robbery. Defendant told Robles to "stop being a pussy," and directed Robles to put on his black hoodie jacket. Robles complied. He pulled the hood of the jacket over his head, and got out of the car.

Robles started a conversation with the three women and then followed them to a car. A.P. watched as Robles rifled through their car. While Robles was so engaged, a police officer drove into the parking lot. At this point, defendant told A.P. to drive to a nearby gas station. A.P. complied and parked the car. Defendant told A.P. not to try anything funny, and he grabbed her money, car keys, and cell phone and got out of the car. After putting some gas in the car, defendant got back in and directed A.P. to drive into a residential area.

Defendant directed A.P. to an area with little lighting. He tried to kiss A.P. and he grabbed her breast. She said "no" and pushed his hand away. Defendant tried to grab A.P. between her legs, but she blocked him with her hand. A.P. again said, "no." She also told him she had been molested as a child, thinking he would have compassion for her. Defendant responded, "I feel for you," or "I can respect that," and told A.P. to drive back to the Starbuck's parking lot. However, when they got there the police officer was still present so defendant told her to keep driving.

Defendant then directed A.P. to park on the street in front of a trucker's parking lot. The area was dark and deserted. Defendant removed the key from the ignition and got out of the car. A.P. begged him to let her go home, but defendant said he had one more thing to do. He became angry and told A.P. he was in charge. Then he asked A.P. if she wanted to be raped. A.P. said, "No, please," and apologized.

4

Defendant reached into the car and released A.P.'s seat so it reclined. Defendant got on top of A.P. and tried to pull down her pants. A.P. continued to object, but it made no difference. As she struggled, defendant said, "Do you want me to hit you?" Defendant managed to get A.P.'s pants down to her knees, and he tried to put his penis in her vagina. Although difficult, defendant eventually managed to pull off A.P.'s pants and shoes, and then inserted his penis in her vagina. A.P. continued to object. She even told defendant she was on her period and had AIDS, but to no avail. A.P., who was crying, then made eye contact with defendant. At this point, he abruptly got off of her and said, "I'm sorry." As A.P. put her clothing back on defendant said, "I'm sorry. I'm going – I wish I could die. I'm going to go to jail because of what I did to you."

Defendant drove the car to Corona, pulled off the freeway, and parked. When he got out of the car, defendant threw A.P.'s phone into the trunk to prevent her from calling the police. After defendant walked away, A.P. drove away. She drove for approximately 20 minutes before she pulled over and retrieved her phone. She called her mother, and then drove back to the Taco Bell where she worked. She told one of the managers what had happened and then drove home. A.P.'s mother advised her to call the police, but A.P. was afraid defendant would come back and hurt her. Eventually, A.P.'s mother convinced her to call the police.

A.P. positively identified defendant from a photographic lineup. His DNA was later collected from the front seat of her car.

*April 26, 2009*

As Donald walked to a bus stop in Garden Grove, he noticed defendant and several companions walking toward him. Defendant approached Donald and asked, "Where are you from?" Donald, thinking defendant meant to ask where he lived said, "Anaheim." Defendant repeated, "Where are you from?" Then he demanded Donald turn over his iPod. Donald said, "I'm not looking for any trouble; I'm just trying to get home." One of defendant's companions said, "Come on, man. This guy is chill. He is

5

not going to give you any problems." However, the next thing Donald remembered was waking up in the hospital. Later, he learned he had made a 911 call from a location near the assault. The police officer who responded to his call testified Donald was disoriented when first contacted, and it was apparent he needed immediate medical care. Donald's right eye had a cut that required 15 to 16 stitches, and he had a large lump on the back of his head. Donald needed an overnight hospital stay to recover from his wounds, and his iPod and cell phone were missing.

*April 27, 2009*

Juan was at Lampson Elementary School sitting on his bike and waiting to play handball with his cousin, Mario P., and his friend, Ivan, when defendant, Robles, and a few other young men jumped a fence and rushed toward Juan. Juan heard someone say, "That's him. Let's get him." He heard defendant or Robles say, "Fuck F-Troop," and "F-Troop, this is Santa Ana Drifters." Defendant also told Robles to spit on Juan and start a fight, and Robles did just that. Juan hit Robles first, but defendant joined the fray and repeatedly hit Juan in the back of the head before both he and Robles started to pummel Juan. During the fight defendant said, "This is Santa Ana Drifters gang."

When the fight ended a few minutes later, defendant shoved and pushed Juan while Robles took Juan's bike. Defendant said, "What are you going to do about it? This is Santa Ana Drifter's gang," and "Next time you disrespect my hood, you better think twice." Juan suffered bruises and swelling on his body as a result of the attack.

Garden Grove Police Officer Sean Salazar responded to an assault report at Lampson Elementary School. He spoke to defendant, Antonio Marquez, Donald Jamaka, and Oscar Hernandez. However, defendant was uncooperative, and he was later transported to a juvenile detention center. During a search at the detention center, police officers found Donald's iPod in defendant's front pants pocket.

Salazar interviewed defendant at the Garden Grove Police Department's juvenile detention center. Juan had told Salazar he heard "gang slurs" during the fight

6

with defendant. When Salazar asked defendant if he was an active gang member, defendant replied he "was from Drifters in Santa Ana." Defendant also told Salazar that Robles, aka Looks, and Jamaka, were also members of the Drifters gang, and they had been involved in the fight with Juan. Defendant said he had been jumped into the gang about three years earlier, and his gang moniker was "Hueso," which means bones in Spanish. Defendant said he got that nickname because he smoked a lot of methamphetamine and was thin.

Defendant also told Salazar the Santa Ana Drifter's gang had six members, and the gang claimed Fifth Street and Harbor Boulevard as their gang territory. He also said his gang had various rivals such as the 17th Street gang, Santa Nita Street gang, Fifth Street gang, the Lopers, Hard Times and F-Troop, and other street gangs like Boys in the Hood of Anaheim and other Drifters gangs in Los Angeles and Anaheim were considered allies. Defendant said, "if the Drifters gang in Santa Ana needed backup or needed help with something, all they would have to do is make a phone call to either Anaheim Drifters or Los Angeles Drifters, who would respond to their needs."

Defendant also claimed he had fought members of F-Troop and Lopers gangs. He explained these fights had started with someone from the rival gang asking defendant "where he was from . . . ." He also told Salazar his gang's code of conduct required its members to represent themselves as Drifter's gang members in the community, and to never back down from a fight.

Eventually, defendant said he and his friends went to Lampson Elementary School to play handball. When they got there, several people were already on the courts. Defendant said he walked over to them and heard someone say, "What's up, eh?" Defendant replied, "Drifters Santa Ana." Defendant admitted he "hit up" Juan, explaining he asked Juan where he was from. Juan denied being a gang member. He also told defendant he did not want to have problems. Defendant replied by saying, "Fuck F-Troop. Fuck trombas."

7

Robles then told defendant that Juan had "disrespected" his hood. Defendant asked Juan, "What's your problem with my hood?" Again, Juan told defendant he was not a gang member and he did not want any problems. Defendant told Robles to "smack that fool," and turned around. Defendant said he heard punches and turned around in time to see Juan punching Robles. Defendant then intervened in the fight between Juan and Robles because he had "to get his homie's back." Defendant admitted punching Juan in the face with his closed fists.

Although defendant claimed he had consumed 40 ounces of malt liquor before the fight, Salazar saw no visible signs of intoxication or impairment. Defendant admitted he and Robles fought Juan, but he denied seeing Robles flee on Juan's bicycle. The following day, police officers searched Robles bedroom and found the word "Drifters" written in permanent marker on the wall.

*Defendant's Pretrial Statement*

In July 2009, Garden Grove Police Detective Aaron Nelson interviewed defendant at the Orange County jail. After waiving his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), defendant told Nelson "a couple versions of what happened" with A.P. on April 25. Initially, defendant denied knowing anything about the crime. Later, he told Nelson he did remember what happened and Robles had the knife. And still later, defendant admitted he possessed the knife. He admitted using a false name when he was arrested, and he claimed to be associated with the Drifters gang.

Defendant told Nelson he had been in the area of A.P.'s apartment complex when he thought he saw "an enemy of some kind, and [he] didn't want to get shot, so he decided to run, and ran to that area." Initially, defendant claimed he could not remember raping A.P., but later he admitted having sex with her in her car. He admitted getting into A.P.'s car and pointing a knife at her while she drove. Defendant told Nelson he wanted to get some money, and he admitted he and Robles committed a couple of robberies, possibly on the same night.

8

## DISCUSSION

### 1. *Sufficiency of the Evidence – General Principles and Standard of Review*

"When an appellant challenges the sufficiency of the evidence, the reviewing court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citation.] If the circumstances reasonably justify the jury's finding, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. [Citation.] For evidence to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value. [Citation.]" (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511.)

"In making our determination, we focus on the whole record, not isolated bits of evidence. [Citation.] We do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. [Citation.] We will not reverse unless it clearly appears that on no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict. [Citations.]" (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322.) We review the sufficiency of the evidence to support a true finding on an enhancement under the same standard as for a conviction. (See *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)

### 2. *Great Bodily Injury Finding*

Defendant does not challenge the sufficiency of the evidence to prove Donald suffered great bodily injury, and with good reason. Donald testified he suffered a large bump to the back of his head and a cut around his right eye that required 15 to 16 stitches, and his injuries required an overnight hospital stay. Instead, defendant asserts the evidence is insufficient to prove he is the person who caused these injuries. We conclude the evidence is sufficient to support the great bodily injury finding.

9

The trial court instructed the jury with CALCRIM No. 3160, which states: "If you conclude that more than one person assaulted Donald and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Donald if the People have proved that: [¶] 1. Two or more people, acting at the same time, assaulted Donald and inflicted great bodily injury on him; [¶] 2. The defendant personally used physical force on Donald during the group assault; [¶] 3. The physical force that the defendant used on Donald was sufficient in combination with the force used by others to cause Donald to suffer great bodily injury. [¶] The defendant must have applied substantial force to Donald. If that force could not have caused or contributed to the great bodily injury, then it was not substantial."

Defendant acknowledges at least two people were involved in the battery on Donald, and admits he was "active in the confrontation." His main quibble is with the third element to be proved, namely whether the evidence establishes the force defendant used was sufficient in combination with the force used by another to cause great bodily injury. We believe the evidence is sufficient to establish this third element.

When a group beating is involved, it is irrelevant that the evidence was murky on the issue of exactly which person caused specific injuries so long as the evidence established defendant and at least one other person participated in a beating that resulted in significant bodily injury. (*People v. Modiri* (2006) 39 Cal.4th 481, 486; *People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1418.)

In this case, defendant approached Donald, issued a challenge, and demanded Donald turn over his iPod. One of defendant's companions tried to get defendant to leave Donald alone, but his friend's advice fell on deaf ears. Donald ended up in the hospital, and defendant gained possession of Donald's coveted iPod. It matters little which person threw the first or last punch, as defendant claims. Defendant and Robles fought Donald and together they caused his injuries. Thus, sufficient evidence supports the jury's great bodily injury finding on count 5.

10

Defendant relies on *People v. Cole* (1982) 31 Cal.3d 568 (*Cole*) and *People v. Rodriguez* (1999) 69 Cal.App.4th 341 (*Rodriguez*) to support his argument, but neither case is on point. Neither case involved a group beating, such as the case before us.

In *Cole,* the question was whether a robber who ordered a physical assault, but who did not physically participate in it, was subject to the great bodily injury enhancement. The Supreme Court in *Cole* found the language of section 12022.7, subdivision (a) to be clear in requiring "the individual accused of inflicting great bodily injury [to] be the person who directly acted to cause the injury." (*Cole*, *supra*, 31 Cal.3d at p. 572.) It considered the dictionary definition of "'personally,'" to mean "'done in person without the intervention of another; direct from one person to another,'" and found no reason to depart from the unambiguous language of the section. (*Ibid.*)

In *Rodriguez,* the issue was whether a prior conviction was a felony "'in which the defendant personally inflict[ed] great bodily injury on any person, other than an accomplice . . . .'" (*Rodriguez*, *supra*, 69 Cal.App.4th at p. 346.) The trial court instructed the jury "'a person personally inflicts injury to another when he directly performs [an] act or acts that cause the physical injury.'" (*Ibid.*) However, the trial court also instructed the jury that, "'[c]riminal law has its own particular way of defining cause. A cause of injury is an act that sets in motion a chain of events that proceed a direct, natural and possible consequence of the act, the injury, and without which the injury would not occur.'" (*Id.* at pp. 346-347.)

The reviewing court found error in the court's latter comments, stating, "The instruction expressly equates 'personally inflict' with 'proximate cause.'" (*Rodriguez*, *supra*, 69 Cal.App.4th at p. 347.) However, "[t]o 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it." (*Ibid.*) The appellate court concluded the trial court's instruction was erroneous because it allowed the jury to find liability if the injury was "a 'direct, natural and probable consequence' of

11

Rodriguez's action, even if Rodriguez did not personally inflict the injury." (*Id.* at pp. 347-348.)

*3.  Criminal Street Gang Convictions and Findings*

Defendant next challenges the sufficiency of the evidence to support the criminal street gang convictions and findings. Specifically, he contends the prosecution failed to prove the Santa Ana Drifters is a criminal street gang, because the evidence is insufficient to prove the "primary activities" and "pattern of criminal activity" elements of a criminal street gang.  (§ 186.22, subds. (e), (f).)  This contention has merit.

A "'criminal street gang'" is any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more statutorily enumerated offenses, and whose members individually or collectively engage in or have engaged in a *pattern of criminal gang activity*.  (§ 186.22, subd. (f); see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319-320, 323 (*Sengpadychith*).)

To establish the primary activities element, the prosecution must prove a group with a common name or identifying signs or symbols commits certain statutorily specified crimes as "one of the group's chief or principal activities."  (CALCRIM Nos. 1400, 1401; see § 186.22, subd. (f); *Sengpadychith*, *supra*, 26 Cal.4th at pp. 319-320, 323.)  To establish the group's primary activities, the trier of fact may consider past offenses as well as the present, charged offenses.  (*Sengpadychith*, at p. 323.)  The offenses must be one of the group's "chief" or "principal" occupations, which necessarily excludes "the occasional commission of those crimes by the group's members."  (*Ibid.*; see also *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 (*Alexander L.*) [isolated criminal conduct insufficient]; *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [retaliatory shootings of a few individuals over a period of less than a week plus one beating six years earlier insufficient to establish the required criminal activity].)  Sufficient proof of the gang's primary activities "might consist of evidence that the

12

group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Sengpadychith*, at p. 324.)

A gang expert's testimony may provide sufficient evidence of a gang's primary activities. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *People v. Gardeley* (1996) 14 Cal.4th 605, 620; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223.) However, in this case the prosecution did not call a gang expert. Instead, the prosecution relied on defendant's own pretrial statements to Salazar and evidence of his three-day crime spree, to fill the evidentiary gaps. But defendant correctly points out this evidence does not prove the Santa Ana Drifters "consistently and repeatedly" committed predicate offenses.

As a threshold matter, we note that before Salazar testified, defense counsel objected to his testimony on grounds the prosecution had failed to establish a corpus delicti for the gang crimes and enhancements "in anticipation that the court would have grounds to grant" a judgment of acquittal under section 1118.1 at the conclusion of the prosecution's case. Later, defense counsel focused on the sufficiency of the evidence to prove the primary activities and pattern of criminal gang activity elements.

Assuming without deciding the admission of defendant's pretrial statements to Salazar did not violate the corpus delicti rule, defendants statements were not evidence he belonged to an ongoing group whose chief or principal activity was to commit one or more of the enumerated offenses. To the contrary, defendant's statements merely proved he and his friends committed the crimes charged. Furthermore, other than defendant's statements, there is no evidence defendant and his cohorts belonged to any ongoing group that consistently and repeatedly committed robberies or carjackings.

In sum, the evidence presented proved nothing more than for a few days defendant and his friends, specifically Robles on two occasions, enjoyed roaming about in an area they claimed as their own, causing fights and stealing personal property. This evidence is simply insufficient to establish the primary activities element of the gang

13

crimes and enhancements. (Cf., *Alexander L*, *supra*, 149 Cal.App.4th at pp 612-614; *People v. Perez* (2004) 118 Cal.App.4th 151, 157-160.)

The same is true with respect to the pattern of criminal gang activity element. A pattern of criminal activity is the commission of two or more enumerated offenses "on separate occasions, or by two or more persons." (§ 186.22, subd. (e); CALCRIM Nos. 1400, 1401.) A pattern may be established by multiple occasions of criminal activity, or by showing multiple gang members participated in a single occasion of criminal activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 5.) Robbery and carjacking, the crimes on which the prosecution relied in this case, are two of the enumerated crimes. (§ 186.22, subd. (e)(2), (21).)

Defendant argues "logic and fundamental principles of due process" prevent punishment for gang activity here because the Santa Ana Drifters became a criminal street gang only after defendant and his friends committed the instant crimes. The problem, however, is even more fundamental. The prosecution's decision to forgo gang expert testimony left the jury with no information about criminal street gangs in general, or the Santa Ana Drifters gang in particular. While the crimes committed here are certainly relevant, they are insufficient to establish a pattern of criminal gang activity with respect to an identifiable group that meets the definition of a criminal street gang.

Therefore, we reverse the active participation in a criminal street gang convictions on counts 6 and 9 (§ 186.22, subd. (a)), the true findings counts 1, 2, 5 and 7 (§ 186.22, subd. (b)), and the true finding count 8 was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). This partial reversal moots defendant's contention the trial court erred by failing to define the phrases "'personally committed by two or more persons'" and "'separate occasions'" as those phrases appear in CALCRIM Nos. 1400 and 1401. In addition, this partial reversal and our remand for resentencing moots or at least makes premature defendant's contentions the sentence imposed violates

14

the constitutional prohibitions against cruel and unusual punishment and the constitutional guarantee of equal protection.

*4. Sentencing for Kidnapping during a Carjacking and Kidnapping to Commit Robbery*

Defendant next claims the trial court's imposition of sentence on both count 1 and count 2 violates section 654. We disagree.

Section 654 prohibits punishment for two offenses arising from the same act or a series of acts constituting an indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1216.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; see *Latimer*, at p. 1208.)

On the other hand, if the defendant entertained multiple, independent criminal objectives that were not incidental to each other, he or she "may be punished for each statutory violation committed in pursuit of each objective" even though the violations were otherwise part of an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "'The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple.' [Citation.] 'A defendant's criminal objective is "determined from all the circumstances."'" (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469.)

Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) Its findings will not be reversed on appeal if there is any substantial evidence to support them. (*Hutchins*, at p. 1312.)

The trial court here found the crimes against A.P. "occurred in one day, but [at] different times and [with] different criminal intents. That was clear, clear as day, from the evidence that came out at trial, and clearly with multiple criminal objectives."

15

Thus, while the trial court agreed defendant committed one kidnapping, it determined, "the purpose of the kidnapping, carjacking and robbery occurred at different times and locations." Substantial evidence supports these findings and determinations.

Defendant approached A.P. while she was getting into her car, pointed a knife at her, and said "give me your car." He directed her to the passenger seat while Robles jumped into the back. Defendant drove the car toward the freeway. While he drove, defendant noticed A.P.'s purse on her lap. He gave the purse to Robles and told A.P. he needed money to bail a friend out of jail in Lake Elsinore. Later, he mentioned he wanted to rob people so he could get beer and methamphetamine. Thus, substantial evidence supports the trial court's finding defendant first formed an intent to commit a carjacking and then later formed a separate and distinct intent to rob her.

Defendant contends he harbored the intent to take A.P.'s property, including her car, before the kidnapping. Consequently, he asserts, both kidnappings occurred simultaneously and constituted one continuous transaction. This certainly is a plausible way to view the evidence. However, the standard of review gives deference to the trial court's assessment of the evidence. We are not permitted to substitute our view of the evidence when substantial evidence supports the trial court's contrary decision. (See *People v. Green* (1996) 50 Cal.App.4th 1076, 1085 ["[w]e review the trial court's findings 'in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence.'"].)

*5. Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Finally, defendant claims the prosecutor committed misconduct during closing argument by misstating the law with respect to criminal street gangs and defense counsel was ineffective by failing to object to the prosecutor's misstatement. Defendant specifically asserts the prosecutor told the jury they could rely on future crimes to prove the primary activities and pattern of criminal gang activity elements of the definition of a

16

criminal street gang. Once more, these issues are moot because we reverse all of the criminal street gang convictions and findings on other grounds.

We also note, "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion——and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Hill* (1998) 17 Cal.4th 800, 820.) The necessity of either a timely objection and/or a request for admonition is waived if making either would be futile. (*Ibid.*) Defendant fails to address the Attorney General's forfeiture argument, but we address the merits in any event, if only to forestall defendant's companion ineffective assistance of counsel claim.

With respect to defendant's claim the prosecutor mistakenly argued future crimes could establish the "'primary activities'" and "'pattern of criminal gang activity'" elements of the statutory gang definition, the prosecutor did rely on the charged crimes to prove both elements. However, defendant does not adequately explain how that equates to an assertion future crimes evidence could also be considered. There was no evidence of crimes committed *after* or even before the charged crimes were committed. Consequently, defendant's prosecutorial misconduct and ineffective assistance of counsel claims based on this portion of the prosecutor's argument are meritless.

## DISPOSITION

We reverse the criminal street gang convictions on counts 6 and 9, and the criminal street gang findings associated with counts 1, 2, 5, 7 and 8.  We affirm the convictions on counts 1, 2, 4, 5, 7 and 8, as well as the deadly weapon and great bodily injury findings associated with counts 1, 2 and 5.  We remand the matter to the trial court for resentencing on the remaining counts and enhancements.[1]


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

---

[1]  Garcia also rightly observes the abstract of judgment inaccurately reports the jury found true a great bodily allegation rather than a criminal street gang allegation on count 7.  The Attorney General concedes the error, and we direct the trial court to correct the abstract of judgment on this point after the resentencing hearing.