Filed 9/29/16  P. v. Williams CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER TRAMEL WILLIAMS,<br><br>    Defendant and Appellant. | B264854<br><br>(Los Angeles County<br>Super. Ct. No. NA100099) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Christopher Williams of one count of first degree murder and one count of unlawful possession of a firearm by a felon. In addition to finding true various firearm enhancements, the jury found true gang allegations as to both counts. On appeal, defendant challenges the gang enhancement findings. Defendant contends there was insufficient evidence to support a finding that one of the primary activities of his gang was a crime listed in Penal Code section 186.22, subdivision (e).[1] We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of June 27, 2014, law enforcement discovered the body of Marcel Johns on a street in Long Beach. Johns was shot and killed while riding a motorcycle. Police identified defendant as a suspect and arrested him on August 29, 2014.

In a recorded interview with police, defendant admitted being affiliated with the "Naughty and Nasty" gang. Defendant told police that at an unspecified time before the shooting, members from a rival gang, East Side Pain, drove by a park where defendant was hanging out with friends. The East Side Pain members yelled things as they drove past, "[b]asically fuck the hood and killing and all that shit." Defendant also believed East Side Pain gang members, including Johns, shot at him while he was walking. Defendant said his associates later criticized him for not taking action. They suggested he needed to do something to retaliate.

On June 27, 2014, defendant and two other men drove to the area where the altercation with East Side Pain members had occurred. Defendant had a gun.[2] Defendant

---

[1] All further statutory references are to the Penal Code.

[2] Defendant told police the gun was not his. He at first said he and the men with him got guns from a "Mexican dude." Later he said this was a fabrication and the guns used in the shooting were not really owned, but were "passed on," by "people from the hood." He later admitted "Tiny MD" was the person who had passed the gun on to him. He agreed with one of the officer's characterizations of Tiny MD as "the person that holds the guns for the, for the hood kind of like or hold onto them and passes them out, things like that, collects them and stuff like that. . . ." According to the gang expert, Tiny

2

saw Johns on a motorcycle; he recognized Johns as an East Side Pain gang member. Johns had not physically accosted defendant, but he had "banged on [defendant]," meaning he said disparaging things to defendant about defendant's gang. Defendant believed Johns was in the group of people who had previously shot at him. When defendant and the other two men believed they recognized Johns as "one of [East Side Pain]," defendant and another man, "Little Yon," fired their weapons. Defendant was in the front passenger's seat. He fired his gun at Johns from the window of the car. He estimated he was 10 feet away from Johns. He fired as the car passed Johns, discharging around three rounds. Around three days after the shooting, defendant left Long Beach and had not returned by the time of the arrest. After the police interview, defendant spoke to his mother in a recorded jailhouse telephone call. Defendant told his mother, "Oh my gosh, I told them everything mom. . . . I told them everything."

A jury found defendant guilty of one count of first degree murder (§ 187, subd. (a).) The jury found true allegations that defendant personally used and intentionally discharged a firearm, causing great bodily injury and death, within the meaning of former section 12022.53, subdivisions (b), (c), and (d). The jury also found true allegations that a principal personally and intentionally used and discharged a firearm, causing great bodily injury and death, within the meaning of former section 12022.53, subdivisions (b), (c), (d), and (e)(1). The jury found defendant guilty of one count of possession of a firearm by a felon, with one prior (§ 29800, subd. (a)(1).) The jury further found true gang enhancements as to both crimes.

The trial court sentenced defendant to a total prison term of 57 years to life.

**DISCUSSION**

I.       **Substantial Evidence Supported a "Primary Activities" Finding**

Defendant's sole contention on appeal is that the evidence was insufficient to support the jury's finding that the gang enhancements were true. Defendant argues the evidence did not sufficiently establish that one of the Naughty Nasty gang's primary

---

MD was not a Naughty Nasty gang member, but instead belonged to a different gang that had teamed up with Naughty Nasty in a rivalry with East Side Pain.

activities was the commission of one or more of the crimes listed in section 186.22. We affirm.

### A. Gang Expert Testimony

Long Beach Police Officer Jeremy Boshnack testified as a gang expert. Boshnack was a member of a team focused on violent crimes, including gang crimes. He had been a police officer for eight years, had received instruction on gangs, and had attended "gang investigator school." Boshnack had worked "gang sweeps" with federal, state, and local law enforcement. He had investigated gang-specific crimes and had written and served search warrants on gang members. He had also arrested numerous gang members and was a court-qualified gang expert. Although he admitted on cross-examination that he was in his first year as a gang expert, he had been contacting gang members and investigating gang crimes for the entirety of his career.

The Naughty Nasty Crip gang was active in the area in which Boshnack had worked for almost five years. He had engaged in "numerous" contacts with Naughty Nasty gang members and had arrested members of the gang. At trial, Boshnack described the gang's common hand sign and the gang's common colors and symbols. According to Boshnack, the gang had approximately 15 active members.[3] The gang claimed the greater North Long Beach area, but most members lived in a smaller area of Long Beach. Boshnack identified the gang's rivals; East Side Pain was the "most prominent" rival at the time of trial. Johns was an East Side Pain gang member.

When asked about the gang's primary activities, Boshnack answered they were "[m]ainly possession of firearms, and in this case murder." The People then introduced evidence of two crimes committed by Naughty Nasty gang members: an October 2009 conviction for violation of former section 12025, subdivision (a)(1), carrying a weapon concealed within vehicle or on person, and a November 2009 conviction for violation of former section 12021, subdivision (a)(1), possession of a firearm by a felon or drug addict. Boshnack was familiar with the defendants in both cases; he had contacts with

---

[3] On cross-examination, Boshnack testified he knew "about 12" of the 15 active members.

4

both men and both had informed him they were members of the Naughty Nasty gang. Both men also had gang-related tattoos.

Boshnack testified that in the course of his duties he often reviewed reports generated by other officers and detectives regarding crimes that appeared to be gang-related. He opined that of the three individuals defendant had mentioned in his interview with police, the two who were in the car with defendant during the shooting were also Naughty Nasty gang members, and the third was affiliated with a gang that had teamed up with Naughty Nasty to combat East Side Pain.

When presented with hypothetical questions mirroring the facts of the case, Boshnack opined the shooting would be in association with the gang, and would benefit the gang by making it seem more violent. Boshnack also opined the shooting would benefit the individual shooter by allowing him to elevate his status, and to be known as more violent and as someone willing to "put in work" for the gang. Boshnack further opined that as to a hypothetical gang member who was shot at by a rival gang member, then, a few days later, saw someone he believed was the shooter from the rival gang, that hypothetical gang member's aim would be to "eliminate the threat of further getting shot," and to avoid appearing weak to his fellow gang members.

On cross-examination, defense counsel and Boshnack had the following colloquy:

"Q: But at least prior to this particular shooting . . . the main activit[ies] were drugs and gun possession, correct?
A: In the last couple of years they have had a murder case before this.
Q: Conviction?
A: Yes.
Q: And who was that?
A: If I remember his name off the top of my head, Little Tunes. I don't remember his name."

### B. Applicable Legal Background

Under section 186.22, subdivision (b)(1), a defendant is subject to additional punishment when convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The statute defines a

criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) The enumerated criminal acts include violations of former sections 12021 and 12025, as well as homicide. (§ 186.22, subds. (e)(3), (31), (32).)

In *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*), the California Supreme Court concluded the primary activities element may be satisfied by expert testimony in the form of an opinion regarding the primary activities of the gang, including crimes reflecting past conduct of members of the gang and acts committed at the time of the charged offenses. (*Id.* at pp. 322-323.) The court further explained "[t]he phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Id.* at p. 323.)

The court offered examples of the evidence that might be sufficient to establish a gang's primary activities: "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*People v. Gardeley* (1996) 14 Cal.4th 605]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subds. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together

6

with information from colleagues in his own police department and other law enforcement agencies. [Citation.]"[4] (*Sengpadychith*, at p. 324.)

Subsequently, in *People v. Duran* (2002) 97 Cal.App.4th 1448 (*Duran*), the court found evidence sufficient to support a primary activities finding where there was gang expert testimony based on several sources of information, including the expert's extensive personal experience in the field and his interviews with over 100 members of the gang at issue. (*Id.* at pp. 1455, 1465.) In *People v. Vy* (2004) 122 Cal.App.4th 1209 (*Vy*), the court found sufficient evidence supported a primary activities finding with respect to a six-member gang that had been in existence for two years. (*Id.* at p. 1219.) There was evidence that over a less than three-month period in 2000, gang members had committed two felony assaults and the attempted murder that was the charged crime in the case. (*Id.* at pp. 1224-1225.) Although there was no evidence the gang committed any enumerated crimes in 1998 or 1999, the evidence of "consistent and repeated criminal activity during a short period before the subject crime" was sufficient to prove the primary activities element. The court found the element was also satisfied through testimony of a police gang expert. (*Id.* at p. 1226.)

In *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*), the court rejected a claim that the gang expert testimony offered was insufficient to support a primary activities finding. The expert had worked in the gang's territory for eight years and was familiar with the gang based on his regular investigations of its activity and interaction

---

[4]    In *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), our high court recently partially disapproved of *People v. Gardeley*. In *Sanchez*, the court adopted the following rule: "When an expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez,* at p. 686.) The court also concluded that if such statements are testimonial, their admission may violate the Confrontation Clause. The court thus disapproved of *Gardeley,* "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, at p. 686, fn. 13.) However, the *Sanchez* court affirmed the principle that an expert may "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, at p. 685, italics in original.)

with the gang's members. He opined about the gang's primary activities, and testified about two predicate offenses. This was sufficient. (*Id.* at p. 1330.)

In *People v. Nguyen* (2015) 61 Cal.4th 1015 (*Nguyen*), the court also found sufficient evidence to support the primary activities element in gang expert testimony. The case involved Asian street gangs, including the defendant's gang. The expert testified that the gang's primary activities included crimes listed in the statute. (*Id.* at p. 1068.) The expert had made contact with close to a thousand gang members and had over 300 hours of advanced training in gangs, with an emphasis on Asian street gangs. (*Id.* at p. 1033.)

In contrast, in *People v. Perez* (2004) 118 Cal.App.4th 151 (*Perez*), *In re Jorge G.* (2004) 117 Cal.App.4th 931 (*Jorge G.*), and *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), courts found the evidence insufficient to support a primary activities finding. In *Perez*, it appeared the gang expert did not explicitly testify about the gang's primary activities. The expert had testified about a previous assault and several shootings committed by the gang within a one-week period; one of the shootings was the charged crime. The court concluded that even if it assumed the gang was responsible for the shootings, "such evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish that 'the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' [Citation.]" (*Perez*, at p. 160.)

In *Jorge G.*, there was no expert testimony about the gang's primary activities, and apparently no other evidence from which it would be possible to infer the gang's members consistently and repeatedly committed any of the statute's listed crimes. (*Jorge G.*, *supra*, 117 Cal.App.4th at pp. 944-945.) In *Alexander L.*, the gang expert's testimony about the primary activities of the gang was merely that he "knew" the gang had committed or been involved in enumerated crimes. As the court further explained: "No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information. He did not directly testify that criminal activities constituted [the gang's] primary activities." (*Alexander L, supra,* 149

8

Cal.App.4th at pp. 611-612.)  Further, on cross-examination, the expert testified the "vast majority of cases connected to [the gang] that he had run across were graffiti related." (*Id.* at p. 612.)  The appellate court concluded even if it could infer the expert was referring to the gang's primary activities, his testimony lacked adequate foundation since no information was ever elicited at trial to establish the basis of his testimony was reliable. (*Ibid.*)  Evidence of the two predicate crimes, without more, did not provide substantial evidence that gang members had consistently and repeatedly committed crimes listed in the statute. (*Id.* at p. 614.)

### C. Discussion

When evaluating a claim of insufficiency of the evidence, including as it relates to an element of a gang enhancement, " 'we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]  'Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed. [Citation.]' [Citation.]  We apply the same standard to convictions based largely on circumstantial evidence. [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1329.)

This case is closer to *Martinez*, *Duran*, *Vy*, and *Nguyen*, than it is to *Perez*, *Jorge G.*, or *Alexander L.*  There was evidence of Boshnack's experience with the Naughty Nasty gang, including his own numerous contacts with gang members, and his review of reports and other information regarding the gang.  This provided a foundation for his opinions about the gang, including his opinion about the gang's primary activities. Boshnack testified that in addition to the charged murder, a Naughty Nasty gang member had committed another murder within the past two years.  The jury could properly consider the charged crime when evaluating whether murder was one of the gang's primary activities. (*Sengpadychith*, at pp. 322-323.)  The gang had only approximately

9

15 members; the jury could reasonably conclude that two murders within two years established homicide was one of the gang's primary activities, consistent with Boshnack's testimony that murder was one of the gang's primary activities. (See *Vy,* at pp. 1225-1226 [existence of three violent felonies by a small, six-person gang over three months was sufficient to satisfy the primary activities element].)

Moreover, the evidence was sufficient to support the conclusion that the Naughty Nasty gang consistently and repeatedly engaged in firearm offenses listed in the statute. Boshnack testified that one of the gang's primary activities was "possession of firearms"; this testimony was accompanied by evidence that in 2009, two gang members committed two firearms offenses listed in the statute, and evidence that defendant committed another enumerated firearms offense in the instant case. From this evidence, the jury could reasonably conclude committing firearms offenses listed in section 186.22, subdivision (e) was one of the gang's chief or principal occupations.

Defendant primarily relies on *Alexander L.* to support his argument on appeal. But unlike the expert in *Alexander L.*, Boshnack expressly testified about the gang's primary activities, and his testimony was supported by adequate foundation. He personally had numerous contacts with the gang's members, he had arrested members of the gang, he had reviewed other materials about the gang, and he was familiar with and testified about two predicate crimes. In this case, the evidence was sufficient to support the jury's finding that one or more of the Naughty Nasty gang's primary activities was a crime listed in section 186.22, subdivision (e).

## DISPOSITION

The trial court judgment is affirmed.

BIGELOW, P.J.

We concur:


RUBIN, J.                    GRIMES, J.

10